UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HARSH IMPORTS, INC.,<br><br>*Plaintiff*,<br><br>-*against*-<br><br>BANK OF BARODA, NEW YORK BRANCH<br><br>*Defendant*. | No. _____<br><br>**COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiffs Harsh Imports, Inc. ("Harsh Imports") for its Complaint against Defendant Bank of Baroda, New York Branch (the "Bank") alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing arising out of the Bank's bad-faith refusal for years to comply with its obligation under a credit agreement to release a $100,000 term loan to Harsh Imports, while simultaneously attempting, in bad-faith and with no basis, to accelerate Harsh Imports' revolving line of credit with the Bank.

2. The Bank has undertaken such conduct pursuant to a recently mandated institutional campaign to rid itself of its smaller borrowers, like Harsh Imports, that it views as less profitable. As the Bank freely admitted to Harsh Imports, it is now under a directive from management to shift its time, energy, and resources to larger, syndicated accounts and away from accounts like Harsh Imports.

3. To that end, the Bank has simply reneged on its express obligations under the credit agreement, and has baselessly attempted to accelerate Harsh Imports' account, pointing far

after the fact to non-existent defaults supposedly occurring years ago, during the height of the Covid-19 pandemic.

4. Harsh Imports is a small, family-run business that sells Indian handicrafts and jewelry. For over 33 years—since 1987—it has been a loyal client of the Bank's.

5. In 2016, pursuant to a credit agreement, the Bank agreed to extend to Harsh Imports a term loan in the amount of $100,000 and to extend Harsh Imports' line of revolving credit from $350,000 to the amount of $550,000.

6. Despite expressly agreeing to extend the $100,000 term loan, however, the Bank has stonewalled all of Harsh Imports' requests over the years for its release. The Bank has no basis for its non-compliance with the terms of the credit agreement.

7. And despite Harsh Imports' consistent and repeated demands over the years, the Bank has failed to explicitly or formally deny Harsh Imports' numerous requests for the term loan. Indeed, the Bank has also failed to provide any plausible basis to Harsh Imports for the Bank's failure to release the $100,000 loan.

8. Recently, in a related action before the Southern District of New York, *Bank of Baroda, New York Branch v. Harsh Imports Inc. and Harssh Madhok A/K/A Harsh Madhok*, 22-CV-02257 (GW) (the "Related Action"), in a desperate attempt to excuse its failure to release the Loan, the Bank falsely claimed that it did not receive certain documents and information from Harsh Imports on which it claimed, after the fact, to have somehow conditioned the release of the loan.

9. When confronted with proof from Harsh Imports showing otherwise, the Bank in in yet another a desperate attempt to excuse its failure to perform, submitted to the court a purported letter dated April 30, 2018, that the Bank claimed showed a request for such

2

documents and information as a condition to releasing the term loan. Harsh Imports, however, had never received the purported letter.

10. The Bank's proffered letter was highly suspicious. It was unsigned, contained no serial number, was not printed on Bank of Baroda letterhead. Further, Harsh Imports had in fact received a letter similar on April 30, 2018—but, critically, the letter that Harsh Imports actually received did not contain the request for information with respect to the term loan.

11. The Bank's proffered letter, in other words, was inauthentic, likely created for the litigation.

12. In any event, even if the Bank had requested such information (it did not), it was not justified in failing to release the term loan.

13. Further, in the Fall of 2021 the Bank prematurely closed Harsh Imports' $550,000 revolving credit line and purported to accelerate repayment of the amount drawn from the account.

14. The Bank had no basis to take this action under the credit agreement. Indeed, the Bank has offered baseless, inconsistent, and shifting post-hoc rationalizations for its purported acceleration of the revolving loan in the Related Action.

15. As it has done with the $100,000 term loan, the Bank has also refused to refund credit for compound interest that it charged to Harsh Imports during the Covid-19 pandemic, despite conceding, in the Related Action that it illegally charged and withheld that money from Harsh Imports.

16. Harsh Imports repeatedly implored the Bank to refund the wrongfully charged interest via letter and email correspondence from December 2020 through June 2021, and again raised the issue in the Related Action.

17. In yet another act of desperation and disingenuity, however, the Bank initially misrepresented to the court that it was permitted to withhold compound interest under the Reserve Bank of India ("RBI") guidelines, despite authority from the Supreme Court of India unequivocally contradicting that position—i.e., it had struck down the very RBI provision cited by the Bank.

18. The Bank has undertaken this wanton course of conduct against Harsh Imports pursuant to its mandate to close small, less profitable accounts, and not because of any supposed breaches by Harsh Imports or supposed impairments of its security interests.

19. As a result of the Bank's breach, bad faith, and baseless invocation of the terms of the credit agreement, Harsh Imports has been prevented from accessing the money to which it is entitled, and thereby unable to execute critical business plans, including the planned launching of a digital platform.

20. Further, the Bank's conduct has put a devastating strain on Harsh Imports' liquidity at a critical time, during and after the Covid-19 pandemic. Harsh Imports has also incurred damages in the form of unnecessary attorneys' fees and costs.

21. Harsh Imports is a small, family-run business and the Bank's dishonest and wanton actions have not only hurt Plaintiff's economically, but they have also caused an enormous amount stress and emotional pain on Harssh Madhok, the owner of Harsh Imports, and his family which depends on the business for their livelihood.

22. Harsh Imports seeks, among other things, injunctive relief requiring the Bank to disburse the $100,000 term loan and to re-open the $550,000 revolving line of credit; compensatory damages for the harm caused to its business and the unnecessary fees spent as a result of the Bank's bad-faith conduct; and punitive damages because of the Bank's bad faith,

deliberate and wanton dishonesty and to deter the Bank from continuing to engage in this sort of bad-faith conduct.

## THE PARTIES

23. Harsh Imports, Inc. was incorporated in New Jersey and has a principal place of business in New Jersey.

24. The Bank was incorporated in India, has its principal place of business in India, and its registered office and its head office are in India.

## JURISDICTION AND VENUE

25. This Court has jurisdiction under 28 U.S.C. § 1332 because Plaintiff is a citizen of New Jersey and Defendant is a citizen of a foreign state and the value of the declaratory and/or injunctive relief sought by Plaintiffs exceeds $75,000.

26. Venue is proper in this District under 28 U.S.C. § 1391, because Defendant is subject to personal jurisdiction in the Southern District of New York, a substantial part of the events or omissions giving rise to these claims occurred in this District.

## FACTUAL STATEMENT

27. Harsh Imports a small family-run business that deals with Indian handicrafts and jewelry. Its sole owner is Harssh Madhok ("Mr. Madhok").

28. Harsh Imports had an approximately 33-year relationship with the Bank, stretching back to 1987.

29. During the parties' long-standing and, until recently, positive relationship, the Bank has extended to Harsh a number of loans—both in the form of term loans and revolving credit lines. Harsh Imports has never once defaulted in 33 years.

30. Indeed, Harsh Imports has been a loyal client of the Bank, having paid close to $3 million in interest costs to the Bank over the years.

**The 2016 Credit Agreement**

31. In 2016, Harsh Imports entered into the Amended and Restated Credit Agreement, dated December 2, 2016 ("Credit Agreement"), with the Bank. A copy of the Credit Agreement is attached as Exhibit A.

32. Under Section III of the Credit Agreement, the Bank agreed to extend to Harsh Imports an additional term loan in the amount of $100,000 ("Term Loan").

33. Prior to entering into the Credit Agreement, Harsh Imports had a revolving line of credit with the Bank in the amount of $300,000.

34. Under Section II of the Credit Agreement, the Bank also agreed to extend the revolving loan to Harsh Imports in the amount of $250,000, for a total credit facility of $550,000 ("Revolving Loan").

35. Harsh Imports agreed to put up certain collateral—with a value in excess of 2 million dollars—on the condition that it received both the $100,000 Term Loan in addition to the additional $250,000 on the Revolving Loan.

36. As the Bank was aware, the purpose of the expansion of Harsh Imports' credit facility from $350,000 to $650,000 was so that it could expand its business to a Direct to Customer (DTC) e-commerce channel.

**The Bank's Campaign to Rid Itself of Small Accounts**

37. In July of 2021, Satya Narayan Patra, the Assistant General Manager and head of the Credit Department of Bank of Baroda, New York Branch, advised Madhok that the Bank's

6

management had given the New York branch, and others, a "mandate" directing it to move away from doing business with smaller borrowers like Harsh Imports.

38. Specifically, during a telephone call in July of 2021, Mr. Patra advised Madhok that the Bank's "higher management" had directed the branch "to focus on the other line of business" such as "Syndication loans" in which 10 to 20 entities participate, instead of the Bank's smaller borrowers, such as Harsh Imports.

39. Mr. Patra explained that he was "giving the hint" to Madhok that the Bank was taking this "specific approach" that his branch was directed to "devote" its "energy and time and everything to this."

**The Bank's Bad Faith Acceleration of the Revolving Loan**

40. Approximately one month after being advised by the Bank that it was ridding itself of small accounts, Mr. Madhok received a letter from the Bank, dated August 24, 2021, purporting to accelerate the Revolving Loan, claiming that Harsh Imports had failed to pay interest.

41. The letter did not state in what month or months Harsh Imports supposedly did not pay interest. It simply stated that "Borrower is in default under the Credit Documents on multiple occasions by reason of its failure to make the requisite payments as set forth in the Credit Documents."

42. The Bank's letter offered no other details regarding the purported default or grounds for acceleration.

43. After purporting to accelerate the Revolving Loan on August 24, 2021, the Bank thereafter sent Harsh Imports two additional letters—dated September 24, 2021, and December

3, 2021—neither of which provided any additional details, explanation, or bases for the Bank's purported acceleration of the Revolving Loan.

44. In August of 2021, the Bank froze the Account and prohibited Madhok from accessing it.

45. Harsh Imports, however, had not failed to make any requisite payments to the Bank.

46. Despite lacking any basis to accelerate the Revolving Loan, on February 8, 2022, the Bank thereafter brought an action in New York Supreme Court, which was later removed to the Southern District of New York by counsel for Harsh Imports.[1]

47. The Bank initially asserted two grounds for Harsh Imports' supposed default.

48. First, the Bank claimed that Harsh Imports had not made interest payments since June 26, 2021.

49. Second, the Bank claimed that it had accelerated the Revolving Loan because Harsh Imports also had "not provided to the Bank (i) annual and quarterly financials or (ii) Borrowing Base statement as required by the Credit Agreement."

50. The monthly Borrowing Base statements that the Bank claimed were missing were from March through October of 2020, during the height of the Covid-19 pandemic.

51. As the Bank was aware, the severe lock downs and deadly waves of Covid-19, temporarily preventing Harsh Imports from submitted such monthly statements.

---

[1] The New York Supreme Court action was captioned *Bank of Baroda, New York Branch v. Harsh Imports Inc. and Harssh Madhok A/K/A Harsh Madhok a*nd bears the Index Number 650658/2022. The Southern District of New York action, under the same caption, bears the case number 22-CV-02257 (GW).

52. Nevertheless, Harsh Imports remained in contact with the Bank and provided it with substantive updates that were not materially different than what would have been provided in a formal Borrowing Base Statement.

53. And as soon as its stakeholders were able to operate again, Harsh Imports provided the Bank with updated information in all subsequent months, and the Bank regularized the account. Indeed, the Bank never complained until after it brought litigation over a year later.

54. After counsel for Madhok and Harsh Imports confronted the Bank's counsel with evidence contradicting both of its purported grounds for acceleration, the Bank switched courses.

55. Specifically, the Bank abandoned its claim that Harsh Imports did not pay interest after June, and instead asserted that that Harsh Imports did not pay April and May interest charges in 2021.

56. The Bank also conceded that Harsh had provided a number of the supposedly missing documents—as it had to when confronted with its own emails contradicting its false narrative—but instead argued that it was accelerating on the basis of such documents being provided late—years ago, during the Covid-19 pandemic.

57. There is no merit to the Bank's action, which remains pending in the Southern District of New York.

58. As a result of the Bank's conduct, Harsh Imports has been denied use of the credit line, upon which it depends to operate a successful business, and has incurred unnecessary legal fees and costs.

**The Bank Refuses to Release the $100,000 Term Loan and Misleads the Court**

59. Section 3.01 of the Credit Agreement provides that the Bank "agrees that, upon the execution of this Agreement, it shall allow the Borrower a Term Loan up to the principal amount not exceeding One Hundred Thousand Dollars ($100,000)."

60. Harsh Imports has paid over $300,000 in interest and fees to service the Revolving Laon with the expectation that the $100,000 Term Loan would be disbursed as set forth in the Credit Agreement.

61. Prior to bringing this action, Harsh Imports and Mr. Madhok repeatedly demanded by via letter, email, and phone correspondence on numerous occasions that Bank of Baroda disburse the $100,000 Term Loan. The Bank, however, has repeatedly and consistently ignored Harsh Imports' demands that the Bank comply with its contractual obligations to do so.

62. In the Related Action, Harsh Imports again raised the Bank's failure to disburse the Term Loan.

63. By way of background, Harsh Imports had received a letter dated April 30, 2018, and signed by TML Balaji, the Assistant General Manager of the Bank at that time. The letter did not ask for any information regarding or as a condition for the release $100,000 term loan. A copy of this letter is attached as Exhibit B.

64. In a desperate and brazen attempt to defend its failure to release the Term Loan in the Related Action, Mr. Patra produced a letter dated, April 30, 2018. Suspiciously, the letter Mr. Patra proffered contained no signature, was not drafted on Bank of Baroda letterhead, and was missing a reference number.

65. Critically, unlike the actual letter that Harsh received on April 30, 2018, Mr. Patra's proffered letter contained a supposed request for information as a condition to disbursing the term loan. A copy of the Bank's proffered April 30 letter is attached as Exhibit C.

66. The Bank falsely claims that it sent Mr. Patra's proffered April 30, 2018, letter to Imports. It did not send the letter. Nor did the Bank ever address the content of the proffered letter with Harsh Imports.

10

67. The evidence suggests that the Bank's proffered letter is inauthentic, likely created for litigation. Upon information and belief, the proffered letter lacks TML Balaji's signature because he was transferred from the Bank's New York Branch to India in 2019.

68. The Bank's assertion that it conditioned the Term Loan on receiving information from Harsh Imports is plainly false.

69. Moreover, despite Harsh Imports' numerous requests by letter and email prior to bringing this litigation, the Bank has never sent Plaintiff a denial letter with respect to the $100,00 Term Loan.

70. The Bank has deliberately, wantonly, and dishonestly refused to disburse the $100,000 Term Loan.

71. The Bank's failure to disburse the $100,000 Term Loan represents a 30% withholding of the of the Bank's total $350,000 commitment against Harsh Imports' collateral.

72. The Bank's failure to release the $100,000 Term Loan has greatly harmed Harsh Imports. Among other things, because of the Bank's refusal to release the Term Loan over the last 5 years, Harsh Imports has been unable implement its e-commerce channel as planned.

73. As the Bank is aware, Harsh Imports negotiated the extension of the credit facility, including both the $100,000 Term Loan and the increase in its revolving credit line with the Bank for the specific purpose of launching its digital platform, which was a critical business plan.

74. Further, the Bank's conduct has put a devastating strain on Harsh Imports' liquidity at a critical time, during and after the Covid-19 pandemic. Harsh Imports has also incurred damages in the form of unnecessary attorneys' fees and costs.

## FIRST CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)

75. Plaintiffs restates and realleges all allegations in this Complaint as if fully set forth in this paragraph.

76. The Credit Agreement is a valid and binding contract between Plaintiff on the one hand and the Bank on the other hand.

77. The Bank's unwarranted closure of the revolving credit line and baseless attempt to accelerate the Revolving Loan under the Credit Agreement is in breach its covenant of good faith and fair dealing.

78. The Bank's bad faith conduct has had the effect of destroying and injuring Harsh Import's right to receive the fruit of the contract—i.e., the access to a credit line in the amount of $550,000.

79. The Bank, moreover, purported to exercise contractual rights malevolently, for its own gain as part of a purposeful scheme designed to deprive plaintiffs of the benefits of the Credit Agreement.

80. The Bank exercised its purported rights for a bad faith purpose—i.e., not because it had a good faith belief that its securities were impaired, but because it wanted to rid itself of small borrowers and instead shift its time, energy, and resources to larger syndicated loans.

81. As a result of the Bank's breach of the covenant of good faith and fair dealing, Harsh Imports has been denied use of the credit line, upon which it depends to operate a successful business, rendered unable to execute critical business plans, lost business, and has incurred unnecessary legal fees and costs.

82. The Bank's breaches have damaged Harsh Imports in an amount to be determined at trial, but no less than $150,000, plus punitive damages and pre and post judgment interest.

## SECOND CAUSE OF ACTION
### (Breach of Contract)

83.     Plaintiff restates and realleges all allegations in this Complaint as if fully set forth in this paragraph.

84.     The Credit Agreement is a valid and binding contract between Plaintiff on the one hand and the Bank on the other hand.

85.     The Bank breached Section 3.01 of the Credit Agreement by failing to release the Term Loan.

86.     Section 3.01 provides that the Bank "agrees that, upon the execution of this Agreement, it shall allow the Borrower a Term Loan up to the principal amount not exceeding One Hundred Thousand Dollars ($100,000)."

87.     But the Bank, without any basis to do so, has refused to release the Term Loan to Harsh Imports as required under the Agreement, and despite Harsh Imports' numerous requests that it comply with its obligation to do so.

88.     The Bank's failure to release the $100,000 Term Loan has greatly harmed Harsh Imports. As a result of the Bank's refusal to release the Term Loan over the last 5 years, Harsh Imports has been unable to execute critical business plans including the launching of a digital platform and has lost substantial business.

89.     Harsh Imports and Madhok fully complied with the terms of the Credit Agreement.

90.     As a result of the Bank's breaches of the Credit Agreement with respect to the Term Loan, Harsh Imports has incurred damages in an amount to be determined at trial, but no less than $300,000.00, plus punitive damages and pre and post judgment interest.

**WHEREFORE**, Harsh Imports demands judgment in its favor and against the Bank as follows:

(a) Compensatory, consequential and punitive damages in an amount to be determined at trial, but which exceeds $600,000;

(b) Punitive damages in an amount to be determined at trial, but which exceeds $500,000;

(c) Consequential damages in an amount to be determined at trial, but which exceeds $500,000.

(d) Specific performance, directing the Bank to disburse the $100,000 Term Loan to Harsh Imports and reinstate Harsh Imports' revolving credit line with the Bank;

(e) Pre- and post-judgment interest;

(f) Attorneys' fees and costs; and

(g) Such other relief as the Court deems fair and appropriate.

Dated: December 12, 2022
New York, New York

**SCHLAM STONE & DOLAN LLP**

*[signature: Joshua Wurtzel]*

By: _____
Joshua Wurtzel
Michael Brodlieb
26 Broadway
New York, New York 10004
Telephone: (212) 344-5400
Fax: (212) 344-7677
jwurtzel@schlamstone.com
mbrodlieb@schlamstone.com

*Attorneys for Plaintiffs Harsh Imports, Inc. and Harssh Madhok*